[No. 1625.]

## W. J. TONKIN, RESPONDENT, v. MAGGIE WINZELL, ET AL., APPELLANTS.

IRRIGATION—WATER RIGHTS—EVIDENCE.

1.  Evidence in an action involving the right to water of a creek for irriga-
    tion *held* insufficient to sustain a finding that it would not, in the irri-
    gation season, flow to certain springs the water from which defendants
    had appropriated prior to plaintiff's appropriation from the creek.
2.  The water of a creek flowing into a stream the waters of which defend-
    ants have appropriated may not be diverted by plaintiff by a later
    appropriation, though loss of water of the creek by seepage and evapo-
    ration would thus be saved.

APPEAL from the Third Judicial District Court, Eureka
County; *W. D. Jones*, Judge.

Action by W. J. Tonkin against Maggie Winzell and
others. From a judgment awarding plaintiff damages and
certain title to water, and an injunction, defendants appeal.
**Reversed.**

The facts sufficiently appear in the opinion.

*E. S. Farrington* and *George A. Bartlett*, for Appellants:

I.   The refusal of opportunity to prepare for trial is an
abuse of discretion. "Parties will not be forced to trial
without a reasonable opportunity to prepare therefor. If a
case has been set for trial at an unreasonably early day, and
by reason thereof a party has been unable to prepare for
trial, the court would abuse its discretion in refusing a con-
tinuance." The court should have continued this trial in
order that a survey might be made. (*Schamberg* v. *Leslie*,
41 S. W. 265; *Green* v. *Culver*, 30 S. W. 426; *Dusy* v.
*Prudom*, 30 Pac. 799; *Radford* v. *Fowlkes*, 8 S. E. 820;
*Johnson* v. *Dinsmore*, 9 N. W. 558.) In *Green* v. *Culver*, 39
S. W. 426, the court made an order on motion of the defend-
ant declaring the necessity of a survey to determine the
rights of the parties and directing that such survey be made
by a surveyor appointed by the court, on notice to the
parties. The court held that the plaintiff had a right to rely
on the survey, and it was error to refuse a continuance on
the ground that the survey had not been made, and to admit
on the trial a survey made by the defendant. In *Schamberg*

v. *Leslie*, 41 S. W. 265, it was held that the court erred in refusing to grant a continuance to defendant to have an order of survey executed.

II. A temporary injunction was served on defendants at the time the suit was commenced. The plaintiff had all the water of the creek. There was no showing that the plaintiff would suffer any damages or inconvenience whatever by reason of the continuance. There was no opportunity after 1896 to make the surveys. After suit was brought and before trial, it was utterly impossible to make the survey. The memory of the witnesses as to what occurred prior to 1896 was uncertain, and, inasmuch as plaintiff was protected by a temporary injunction, he could not have been injured by continuing the case for a few months until a survey could be made. The refusal of the court to continuing the case was a gross abuse of discretion. The court erred in refusing to strike out the testimony of W. J. Tonkin in relation to the nature of the soil on his ranch and the quantity of water needed to irrigate the same. The testimony of W. J. Tonkin and the motion, ruling and exception are as follows (Trans. p. 44, l. 17): "Was using the water of Danny creek as well as the Pete Hansen creek to irrigate the ranch. Did not get any more water from both creeks than was necessary to irrigate my land. The land is gravelly, and takes a great deal of water. I don't know about amount of hay cut. I never attended to that. I know of the loose character of my land and its need of quantity of water because Mr. Crombie and others told me. I never irrigated." "Mr. Farrington— Defendants move to strike out all testimony of the witness in relation to the nature of the soil of his ranch, and the quantity of water needed to irrigate the same, because the answer of the witness shows that it is hearsay." "Mr. Farrington—Defendants except." The hearsay testimony above referred to was to material points, to wit: Damages, amount of water, and necessity of water for the irrigation of the lands for which plaintiff had attempted to appropriate the water of Pete Hansen creek. In order to make out a cause of action, the plaintiff must show that he actually needed the water of Pete Hansen creek for the necessary, beneficial and economic irrigation of his land. No one has a legal right to

waste water. Plaintiff has no right to enjoin defendants from taking water which he is not using beneficially and economically. An excessive diversion of water for any purpose cannot be regarded as a diversion to a beneficial use. Defendants cannot be restrained from taking any surplus above plaintiff's needs. (*Union M. & M. Co.* v. *Dangberg*, 81 Fed. 94, 97, and cases cited; *Deregoy* v. *McKissick*, 79 Cal. 572; *Barrows* v *Fox*, 32 Pac. 811–812.) The refusal to strike out the hearsay testimony is error. This is true even though the evidence is cumulative. (*Spanagel* v. *Dellinger*, 38 Cal. 282; *Clopper* v. *Poland*, 10 N. W. 538; *Collins* v. *Langan*, 32 Atl. 258; *Bornheimer* v. *Baldwin*, 42 Cal. 27–28; *Stephens* v. *Vroman*, 16 N. Y. 381; *Tennessee & C. R. Co.* v. *Danfort*, 20 So. 502–504.)

III.  Error in admitting testimony is presumed to be prejudicial, and upon proper application a new trial will be granted. No distinction in this respect can be made between cases submitted to the court. (Hayne on New Trial and Appeal, sec. 287; *Spanagel* v. *Dellinger*, 38 Cal. 282.) This admission of testimony was actually prejudicial, because the plaintiff was entitled to no injunction until he had proven that he had needed the water of Pete Hansen creek for irrigation of his premises. Without the above-mentioned hearsay testimony his necessity was not proven. A perpetual injunction was granted to the plaintiff. It is only when it appears so clear as to be beyond doubt that the error complained of did not prejudice, and could not have prejudiced, the party against whom it was made that the rule that error without prejudice is no ground for reversal is applicable. (*Smith* v. *Shoemaker*, 17 Wall. 630; *Deery* v. *Cray*, 72 U. S. 795; *R. R. Co.* v. *O'Brien*, 119 U. S. 99; *Mexia* v. *Oliver*, 148 U. S. 664.)

IV.  A most significant fact—a fact which carries with it the strong conviction that there is a continuous channel from the Tonkin dam to the Shipley Springs, and that during the irrigating season the water of Pete Hansen creek flows, save when diverted through that channel into Shipley Springs and thence to the J. D. ranch—is absolute reluctance for counsel for plaintiff to submit these matters to the actual inspection of the court and to the test of the actual survey

and measurement. Though it may spread and sink, though it may run but for a time in the spring, Pete Hansen creek is a watercourse. (*Barnes* v. *Sabron*, 10 Nev. 236; 24 Ency. of Law, 898; Gould on Waters, sec. 264; *Lux* v. *Higgins*, 69 Cal. 418.) An appropriator who has acquired the right to all the waters in its ordinary flow is not entitled to surplus water flowing in the stream during times of extraordinary high water, and cannot restrain the diversion of such surplus by another. (Long on Irrigation, sec. 57; *Edgar* v. *Stevenson*, 70 Cal. 286.)

*Thomas Wren* and *Peter Breen*, for Respondent:

I. Upon what is necessary to constitute a valid location, Long on Irrigation states the following rule: "To constitute a valid appropriation of water there must be an actual diversion of the water from the natural stream or other source of supply with the intent to apply it to some beneficial use, followed by an actual application of the water to the use designed or to some other useful purpose within a reasonable time. An appropriation is an intent to take, accompanied by some open physical demonstration of the intent and for some valuable use."

II. In urging the point upon application for a new trial on the ground of newly discovered evidence, counsel for defendants refer to the affidavit of one McClellan. Precisely what the object of counsel was in filing these affidavits, we confess we do not comprehend. The rule is so well established that an application for a new trial on the ground of newly discovered evidence should show affirmatively that the evidence is new, material and not cumulative; that the applicant has been diligent in preparing his case for trial; that the new evidence was discovered after the trial; and that it is undoubted. (Hayne on New Trial and Appeal. vol. 1, sec. 88.) It only needs a glance at the affidavits of Bartlett, Carletti, Fletcher, and McClellan to see that the newly discovered evidence, so called, on which the motion for a new trial is based, set forth in these affidavits, is simply cumulative, and in addition that the affidavits of Bartlett, Carletti, and Fletcher show an entire absence of anything like diligence on the part of the defendants to prepare for trial.

A motion for a new trial on the ground of the insufficiency of the evidence to justify the decision is addressed to the sound discretion of the court below, as is elsewhere shown. The supreme court will not disturb the ruling of the court below upon a motion for a new trial on the ground under consideration, if there be a substantial conflict . in the evidence. (Hayne on New Trial and Appeal, vol. 1, sec. 97; *State* v. *S. M. Co.,* 5 Nev. 415; *Boskowitz* v. *Davis,* 12 Nev. 446.)

III. In his oral argument counsel for the defendants asserted, with every appearance of candor and earnestness, that the proof established the flow of the water of Pete Hansen creek into the Shipley Springs. The real question in this case is not whether the water may have at times of cloudbursts or unusually rapidly melting of snow in the mountains reached Shipley Springs for a few hours or a day, or perhaps for a week or two weeks, as it did probably in 1890, but whether at all ordinary seasons of the year and stages of the water in Pete Hansen creek it flows into the Shipley Springs. The supreme court of this state has adopted the definition of a watercourse given by Angell on Watercourses, in the case of *Barnes* v. *Sabron,* 1 Nev. 236. All of the witnesses, both for the plaintiff and the defendants, testified that Pete Hansen creek did not come within this definition of a watercourse. First, that the creek has no defined channel down to the Shipley Springs; that the channel ends two or three hundred feet above the Shipley Springs according to defendants' witnesses, and plaintiff's witnesses testified that it is that or a greater distance from the end of anything resembling a channel to the Shipley Springs; that when the water reaches the comparatively level ground it spreads out over the land for considerable distances, and upon the question of there being a channel or no channel there is a substantial conflict of testimony, with the weight of the testimony that there is not a channel being in favor of the plaintiff.

*E. S. Farrington* and *George A. Bartlett,* for Appellants, in reply:

I. Mr. Wren has wholly failed to show in his second brief upon challenge so to do that Pete Hansen creek was not

a continuous watercourse from Tonkin dam to Shipley Springs. He was also challenged to cite the page in the record where any witness has testified that the waters of Pete Hansen creek, when unobstructed during the irrigating season of each ordinary year, do not flow down to Shipley Springs and thence to Mrs. Winzell's ranch, and this he has utterly neglected to do.

II. The refusal of the court to grant the defendants a continuance to enable them to have a survey made and actual test to show that the water would, if unobstructed, flow in the ordinary irrigating season to defendant's premises was an error, for which the judgment should be reversed. (*Hart* v. *State*, 15 Tex. Cr. App. 202; *Brooke* v. *Ry. Co.*, 47 N. W. 76; *Gonring* v. *Ry. Co.*, 47 N. W. 19.) The water of Pete Hansen creek is presumed, until the contrary is shown, to augment the flow of Shipley creek. Though it may spread and sink; though it may run but for a time in the spring; though for two or three hundred feet Pete Hansen creek may run down a sod bank into Shipley Springs, it is a watercourse and within the definition given in *Barnes* v. *Sabron*, 10 Nev. 236.

III. Plaintiff has failed to prove any necessary use of the waters of Pete Hansen creek, except by the hearsay testimony of W. J. Tonkin and John Tonkin. The testimony shows that plaintiff does not need the water of Pete Hansen creek.

IV. Plaintiff is not entitled to damages, to an injunction, or to a decree that he owns the water, because there can be no appropriation without a necessary and beneficial use. The judgment awards to the plaintiff all the water his ditch will carry and enjoins the defendants from interfering with the water. This judgment, in the authority of *Gotelli* v. *Cardelli*, 69 Pac. 8, is erroneous because it disregards the question of necessity. If the hearsay testimony of W. J. Tonkin and John Tonkin is stricken out, there is no testimony showing that plaintiff needs the water of Pete Hansen creek. The court erred in refusing to make any finding of fact as to defendants' use of the waters of Pete Hansen creek. The only finding made was a conclusion of law. That portion of judgment which enjoins the defendants from taking any water out of Pete Hansen creek above the

Tonkin dam, irrespective of whether Tonkin needs or is using water, is against law.

By the Court, TALBOT, J.:

Plaintiff brought this action to recover the water of Pete Hansen creek and $1,000 damages for the diversion thereof from his crops and the breaking of his dam, alleging that he constructed his ditch in 1895, and has ever since used the water for the beneficial irrigation of his lands, excepting when prevented by the wrongful acts of the defendants, and that his appropriation is prior and superior to any of them.

After full denials, the answer alleges that the defendants and their grantors, ever since a time prior to October 11, 1881, have been the owners of the J. D. Ranch and the land embraced in the Shipley Place in Garden Valley, Eureka county, and that during all that time except since the spring of 1897, when wrongfully diverted by the plaintiff, they have appropriated and used all the water of Pete Hansen creek in the necessary irrigation of large crops of hay. The plaintiff was given judgment for $20 damages, the water to the capacity of his ditch, and a perpetual injunction against the defendants.

A part of the findings of the court are: "That Pete Hansen creek has its source in a very high mountain, and is fed exclusively by melting snow and occasional rains in the spring and early summer. That for several miles from its source it flows down through a steep canyon, and affords for about two months or two months and a half during the melting of the snows sufficient water to irrigate thirty or forty acres of land. That from what is known as the 'Tonkin Dam,' in said canyon, to the Shipley Springs, is a distance of about nine miles. About six miles of this distance the descent is considerable, but not so great as in the canyon above. Within about three miles of the Shipley Basin the land is comparatively level. From the mouth of the canyon down to this comparatively level ground the volume of water gradually decreases, until at the point where it spreads out over the adjacent land the volume at all times when there is water, except in times of extraordinary freshets, is compara tively small, and from the point where it spreads out down

to the Shipley Springs the quantity of water gradually lessens during ordinary seasons until it is all lost by evaporation or absorption by the soil.   From the mouth of the canyon down to the point where the water spreads out, the channel of the stream gradually lessens in size, and is divided up at different places into numerous channels until at the point where it spreads out it ceases to have any substantial existence, and from this point to near the Shipley Springs it is difficult, and nearly impossible, to determine from the evidence whether there is any channel at all, and before it reaches the Shipley Springs there is no appearance of a channel at all for several hundred feet."

The defendants duly excepted to these findings, and to the failure of the court to make others prepared and submitted by them, on the controlling issues; and they also took exceptions to the decision and decree on the ground that it is not supported by the evidence, and is contrary thereto.   In particular they specify as error that the portion of the finding relating to the sinking and evaporating of the water is not supported by, and is contrary to, the undisputed testimony.

The record is replete with exceptions.   We will consider those more directly affecting the substantial rights of the parties.

The statements that "the volume of water was comparatively small," and that "the land is comparatively level," would vary greatly in their significance according to the views, sympathies, and leanings of the different witnesses, and such terms in findings are too indefinite and uncertain to serve as a foundation for awarding valuable property.   It would be equally unsatisfactory if the decree itself adjudged to one of the litigants a "comparatively large quantity of water" and to the other "a comparatively small amount." The channel of Pete Hansen creek, at the head of plaintiff's ditch, is in a ravine, which is sixty to seventy feet deep, and which extends down about four miles, to where the creek enters and runs through the upper part of the valley in a well-defined channel a few feet deep.   Then it becomes shallower, and in three places divides into two or three channels, which unite at short distances further down.

Shipley Springs are situated in the upper end of defendant's field, about nine miles below the plaintiff's dam; and the water flowing from there forms what is designated by most of the witnesses as "Shipley Creek," and from which ditches lead the water onto defendant's hay lands. The more specific testimony indicates that less than one-half mile above Shipley Springs, Pete Hansen creek divides into several channels, which become shallower, and disappear, according to some of the witnesses for the defendants, within three hundred feet from Shipley Springs, and according, to other witnesses for the plaintiff a few hundred feet further up; and, judging from the testimony, it is not improbable that in former times, before large numbers of cattle and horses tramped the ground in going to and from water, the channel extended through, but, if it did not, and the water ran to the springs, and was diverted by the defendants' ditches, and used in beneficial irrigation of their crops, they ought to be protected in their appropriation.

From near the end of the Hansen channel to Shipley Springs is firm ground carrying clay covered with sod, and having a "considerable descent." The valley is narrow. The most definite witness estimated the fall at forty feet for the two miles above Shipley Springs, and that the land at right angles to the creek is nearly level from twenty to two hundred feet on the northwest side, and for about one-eighth of a mile on the southeast side. Plaintiff's ditch is about four miles long. It was started in November, 1895, and completed in 1897. It appears, and is uncontradicted, that many years prior to these dates the defendants and their grantors used all the water of Shipley creek in the beneficial irrigation of their lands, and, if the water of Pete Hansen creek flowed into Shipley during the irrigating season before it was taken by the plaintiff, it enhanced the flow in their ditches, and was appropriated by them prior to any diversion by the plaintiff.

There was much conflict of testimony, discussion, and dispute as to where the Hansen channel ends. We think it is of little consequence whether it is a few hundred feet or more further up or down.

On the other hand, it is most important to ascertain

whether the Hansen creek water, when undisturbed by the plaintiff, will, in the irrigating season, run into Shipley Springs in quantities sufficient to assist in the irrigation of defendants' meadows; for, if it will, it was appropriated, and became the property of the defendants long prior to its diversion by the plaintiff, and, if there is not sufficient to run through in dry years, they would be entitled to its use when there is enough to reach their irrigated lands. The finding of the court that "from the point where it spreads out down to the Shipley Springs the quantity of water gradually lessens during ordinary seasons, until it is all lost by evaporation and absorption by the soil," is not supported by the evidence. There is no proof that the water did not run to Shipley, when not diverted by the plaintiff, every year excepting 1889, which was an exceedingly dry one. Several witnesses stated that they had seen the Hansen creek water in varying quantities flowing into Shipley Springs in May and June, and consequently during the irrigating season of different years, and there is nothing to indicate that at these times it was coming from cloudbursts or unusual freshets, as the findings imply. A number of other witnesses testified to seeing water on various occasions at the road crossing above Shipley Springs in amounts large enough to likely flow through.

Referring to those parts of the record which might appear, without careful examination, to support the finding in question, witnesses for the plaintiff testified that the water was running in plaintiff's ditch on May 27, 1900, a fair, but not a large, head; that on June 1st they found it had been turned down the creek, and they followed it on that day to where it ceased to flow about three or four hundred yards above Shipley Springs. Another witness, who was with them, testified that at the same time he followed another channel further to the west, and that the water from it was running to the springs. Without his direct statement, the evidence of the others that it had come down the creek bed and channels in three days, and possibly in one or two, nearly nine miles, and so close to Shipley in that time, supports, rather than contradicts, the general testimony indicating that it flowed through. One witness said that, if

he owned the defendants' ranch, he would not give a four-bit piece for the Pete Hansen creek water. This testimony was given under objection, and was improperly admitted. If the issue had been in relation to the value of the water right, he was not shown to have any knowledge that would qualify him as an expert. When pressed for his reason for placing such a trifling value, he admitted that more water was needed, and would benefit the defendants' ranch, but he said in years when there would be enough in Hansen creek to run Shipley there would be plenty coming from Kelly, Birch, and Willow creeks without it. It developed during his examination that he had not been in the valley for ten years, and it was shown that the conditions on which he based his judgment no longer exist, and that for eight years or more, the water from these other creeks has been used for ranches above, and not allowed to run to Shipley during the irrigating season.

The defendants strongly urged as ground for continuance the necessity of deferring the trial until water could be turned down in the spring or early summer for the purpose of demonstrating whether it would flow to Shipley. The temporary injunction would have protected the plaintiff in the interim, but, unlike the mother of the child before Solomon, he was not willing to turn it to the opposing claimant so that the test could be made. This conduct of the parties. viewed in connection with the undisputed testimony that it runs through, leads to the suspicion that the defendants, who were in a good situation to know, had more faith that the water would flow to the springs than the plaintiff had that it would not. Whether the court ought to have granted the continuance for the purpose indicated need not longer be considered, because the defendants furnished ample testimony on the trial, which was uncontradicted, to establish the fact as they desired.

It is apparent that the evaporation would be more in the flow to defendant's than to plaintiff's lands, but whether the seepage, or the combined seepage and evaporation, would be more or less, is not clear. Plaintiff claims his land is gravelly, and requires a large quantity of water. If his ditch runs a long distance through a similar formation, the absorp-

tion may be greater than over a compact soil where it spreads above Shipley after running swiftly through the ravine. As the distance from the plaintiff's dam to the springs is fully twice as long as plaintiff's ditch, and it spreads more on the longer course, we may assume that the amount lost by seepage and evaporation together is larger in the flow to defendants' premises. If conceded or established that this loss is much greater than that through the plaintiff's ditch, that ought not to deprive the defendants of their water acquired by prior diversion; nor should their earlier appropriation be taken from them because the water spreads, and a larger proportion of it sinks and evaporates in the flat above or in the swamp below Shipley Springs.

The undisputed evidence shows that the water came from a well-defined creek and channel, and ran through in the irrigating season to where it increased the volume in defendants' ditches.

Many streams came out of lakes fed by seepage, melting snow, or springs, and not unfrequently in their course they spread over ponds, swamps, and level places, again running into channels, from which they have been diverted, and are held by right of prior appropriation as securely as if they had followed narrow courses or creek beds all the way, or did not flow from lakes. On the same principle are the cases holding that the prior appropriator secures a right to waste water running from ditches, fields, tailings, and other reservoirs. A contrary rule would unsettle every right on a stream with a lake as its course, or where water had been diverted after it had passed through swamps or ponds, or had spread over level depressions.

The conservation of the waters in this state is the order of the day, and will increase the population and wealth, and is for the public good. It should be encouraged by all legitimate means, but not to the extent of depriving the owner of water already acquired by prior application to a beneficial use.

If waste by seepage and evaporation can be prevented by draining swamps and depressions or by substituting ditches, flumes, or pipes for wide, sandy and numerous channels, or by other means, let this desired improvement and economy be at the expense of the later claimant, who is desirous of

utilizing the water thereby to be saved; or at least without detriment to existing rights, whether up or down the stream.

Although water is too precious a thing to be wasted in these arid regions, where it is so necessary for the support of the homes and prosperity of a large part of our population, and for the production of the food stuffs and agricultural products necessary to sustain the life and promote the happiness of all, and although every owner should be restricted to an economical and beneficial use from his point of diversion, we cannot sanction a policy which inevitably would result in depriving the prior and lower appropriator for the benefit of the later claimant nearer the head of the stream, because the latter would have a greater quantity of water, and consequently more benefit, and would save the seepage and evaporation occasioned by the flow further down to the lands of the earlier settler.

The enforcement of such a doctrine would overthrow the long, well-established and just principles of the law, and result in legal confiscation. It would deprive prior appropriators down the stream of their equities and vested rights, lead to a scramble to secure lands and divert from the heads of streams water already in use by lower proprietors, whose farms would be dried and destroyed.

The finding of the court that the Hansen creek water would not flow to Shipley Springs in the irrigating season, and the refusal to find that it did so flow, and that it had been used by the defendants in the beneficial irrigation of their lands prior to any diversion by the plaintiff and the rendering of the decree in his favor, when the evidence does not support it, require that the judgment be reversed, and we need not determine the objection asserting a failure to show plaintiff's necessity for his ditch full of water in addition to that coming to his place from Dana creek, nor the one relating to the refusal of the court to strike out the hearsay testimony on which the calculation of the amount of hay is based, nor the numerous other specifications of error.

The judgment and decree are set aside, and the case is remanded for a new trial.

BELKNAP, C. J.:   I concur.

FITZGERALD, J., did not sit in the hearing of this case or participate in the opinion.  On the 10th of December, 1900, a motion was made before him, while he was judge of the Third District, to continue said case until after the next flood season, to wit, June, 1901, in order that defendants might see whether or not the water in controversy would run to certain places in dispute.  The granting of said motion would have continued the case over two regular terms of court, to wit, the December term, 1900, and the March term, 1901, and brought the trial not earlier than the July term, 1901.  This motion was denied, and the case was set for trial on the 21st of January, 1901, to which ruling exception was entered. At the trial of the case the said motion was renewed, or a similar motion made, and denied by Judge Fitzgerald's successor on the district bench; to which ruling also exception was entered.  These exceptions—both those as to the ruling made by Judge Fitzgerald before the trial and as to those made by his successor during the trial—were involved in the appeal herein, and, in consequence thereof, FITZGERALD, J., did not participate in any of the proceedings on the appeal to this court; for, of course, neither he nor others could foresee that the case on the appeal here would go off on other questions than the said exceptions, and that those exceptions would not be passed upon, or not need to be passed upon, on the appeal.